1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   RHONDA L. CARTWRIGHT-              Case No. 17-cv-1920-BAS-JMA
     LADENDORF,
12                          Plaintiff,     **ORDER:**

13        v.                            **(1) GRANTING PLAINTIFF'S
                                            MOTION FOR SUMMARY
14                                          JUDGMENT (ECF No. 9);**

15   NANCY A. BERRYHILL, Acting
     Commissioner of Social Security,   **(2) DENYING DEFENDANT'S
16                                          MOTION FOR SUMMARY
                            Defendant.      JUDGMENT (ECF No. 10);
17                                          AND**

18

19                                      **(3) REMANDING ACTION
                                            FOR FURTHER
20                                          PROCEEDINGS**

21

22        Plaintiff Rhonda Cartwright-Ladendorf seeks judicial review of a final

23   decision by the Acting Commissioner of Social Security denying her application

24   for disability insurance benefits under Title II of the Social Security Act ("the Act"),

25   42 U.S.C. §§ 401–33.  Presently before the Court are the parties' cross motions for

26   summary judgment.  The Court finds these motions suitable for determination on the

27   papers submitted and without oral argument.  *See* Fed. R. Civ. P. 78(b); Civ. L.R.

28   7.1(d)(1).  For the following reasons, the Court **GRANTS** Plaintiff's Motion for

                                   – 1 –

Summary Judgment (ECF No. 9) and **DENIES** the Commissioner's Cross-Motion for Summary Judgment (ECF No. 10). The Court will remand this matter to the agency for further proceedings.

## I. BACKGROUND

Plaintiff began working for the California Attorney General's Office in 1987. (Administrative Record ("AR") 58, ECF No. 7.) Years later, as a Supervising Deputy Attorney General, Plaintiff's responsibilities included supervising junior attorneys and often arguing cases before the California Court of Appeal. (AR 67–68; *see also* AR 267–68, 1014.) In early 2005, however, Plaintiff was taken to the emergency room after experiencing lightheadedness and shortness of breath. (AR 76–77.) Dr. Sardul Singh diagnosed her with arrythmogenic right ventricular dysplasia/cardiomyopathy ("ARVD/C"). (AR 809, 1005.) Dr. David Cannom, an ARVD/C specialist, confirmed the diagnosis in 2006. (AR 996; *see also* AR 999–1002.)

ARVD/C is an inherited heart disease that is "characterized by life-threatening ventricular arrhythmias and slowly progressive ventricular dysfunction." (AR 394; *see also* AR 996–97.) As ARVD/C patients' heart muscle cells atrophy, they are replaced with fibrofatty tissue that decreases the heart's capacity to pump blood through the body and triggers ventricular tachycardia.[1] (AR 395, 973.) The condition is progressive, and specialists recommend ARVD/C patients limit their physical exertion and stress to prevent progression of ventricular dysfunction. (*E.g.*,

---

[1] "Ventricular tachycardia is a heart rhythm disorder (arrhythmia) caused by abnormal electrical signals in the lower chambers of the heart (ventricles)." Mayo Clinic Staff, *Ventricular Tachycardia*, Patient Care and Health Information, https://www.mayoclinic.org/diseases-conditions/ventricular-tachycardia/symptoms-causes/syc-20355138 (last visited Sept. 4, 2018). In this disorder, "abnormal electrical signals in the ventricles cause the heart to beat faster than normal, usually 100 or more beats a minute, out of sync with the upper chambers." *Id.* Ventricular tachycardia can cause the "heart to stop (sudden cardiac arrest)," a possibility that "usually occurs in people with other heart conditions, such as those who have had . . . other structural heart disease (cardiomyopathy)." *Id.*

– 2 –

AR 979, 991.)  Treatment of ARVD/C is directed at reducing the frequency and severity of irregular heart rhythms and preventing disease progression—although there is no cure for the chronic disorder.[2]  (AR 991.)

After Plaintiff's condition was diagnosed in 2005, Dr. Singh inserted an implantable cardioverter defibrillator ("ICD") into Plaintiff's chest to monitor her heart, function as a pacemaker, and deliver electric shocks upon onset of ventricular tachycardia.  (*E.g.*, AR 1004; *see also* AR 916–17 (describing the replacement of Plaintiff's ICD in 2011); AR 991 (describing the use of an ICD to treat ARVD/C).)  As explained in the Social Security Administration's impairment listing for arrhythmias, "[i]mplanted cardiac defibrillators are used to prevent sudden cardiac death in individuals who have had, or are at high risk for, cardiac arrest from life-threatening ventricular arrhythmias."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 4.00(F).  "Most implantable cardiac defibrillators have rhythm-correcting and pacemaker capabilities."  *Id.*

Plaintiff's ICD is set to pace her heart rate at a steady 65 beats per minute.  (*See, e.g.*, AR 494 (noting "65 bpm" for the ICD's pacing function).)  If Plaintiff's heart rate rises, and the ICD is unable to pace her heart back down, the device performs electrical cardioversion by releasing an electrical shock to restore Plaintiff's heart rate to a regular rhythm.  (*See* AR 916 (noting when Plaintiff's ICD was replaced in 2010, "[f]irst therapy was programmed at overdrive pacing followed by cardioversion at 15, 25 and 35 joules"); *see also* AR 72–74, 991.)  Plaintiff's ICD has discharged on a number of occasions, producing a sensation she describes as similar to "being hit by a bomb."  (AR 72–73; *see also* AR 996 (noting ICD

---

[2] "In some cases, ARVD/C will progress to the point of requiring a heart transplant."  (AR 991.)  "In the hopes of avoiding a heart transplant, it is recommended that patients avoid" triggers that include "fatigue, alcohol, dehydration, illness, caffeine, stress," and "particularly exercise." (*Id.*)

– 3 –

discharges).) The agency's arrhythmia listing similarly notes that "[t]he Shock is like being kicked in the chest." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 4.00(F).

Aside from her ICD, Plaintiff's heart condition is treated with medications that she testified make her drowsy and affect her concentration and memory. (AR 60–61, 64.) Plaintiff provided explanatory literature confirming the side effects of two of the heart medications she has taken, amiodarone and mexilitine.[3] (AR 1017–26.)

After her ARVD/C diagnosis in 2005, Plaintiff continued to work for five years before retiring with California Public Employees' Retirement System ("CalPERS") disability in 2010. (AR 58.) In the years between her diagnosis and disability retirement, Plaintiff suffered from anxiety that her ICD would discharge at work or while arguing an appeal. (AR 67–69, 72; *see also* 1276.) Plaintiff testified that this anxiety, paired with the side effects of her medications and her decreased heart function, contributed to her inability to concentrate and remember details of her cases. (AR 67–68, 72.) Plaintiff further testified that as her condition progressed, she became too anxious to argue cases in court and would assign her cases to other attorneys she worked with. (AR 68.)

One of Plaintiff's treating cardiologists, Dr. David S. Cannom, stated in 2010 that Plaintiff's ICD discharges have "been extremely difficult episodes for [her] as they involve both discomfort as well as a good deal of anxiety." (AR 996.) The potential psychological toll caused by an ICD discharging is also recognized by the agency: "The shock from the implanted cardiac defibrillator is a unique form of treatment; it rescues an individual from what may have been cardiac arrest. However, as a consequence of the shock(s), individuals may experience psychological

---

[3] At the administrative hearing, Plaintiff reported that she has since been taken off Amiodarone and now takes a different antiarrhythmic medication, sotalol, in addition to tenolol and mexiletine. (AR 63–64.)

– 4 –

distress[.]"[4]  20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 4.00(F).  As a result of this chronic stressor, Plaintiff undergoes treatment for panic disorder and persistent depressive disorder, but she is reportedly stable while on several medications.  (AR 1097.)

Additionally, Plaintiff testified that the physical limitations from her cardiac condition interfered with her ability to move large files around the office, and she could not make it through the workday without hiding in her office and taking two-to-three hour naps behind piles of boxes.  (AR 68–69.)  Plaintiff said she eventually was confronted by another Deputy Attorney General, and at that point realized she was no longer able to perform her duty to the State of California.  (AR 69.)

In 2010, Plaintiff's ICD was replaced, and she testified that another replacement was scheduled for early 2016.  (AR 64, 97, 286.)  Plaintiff is now scheduled to see her cardiologist once per year.  (AR 65.)  Although she experienced multiple ICD discharges while working, Plaintiff has more recently not experienced an ICD discharge in three or four years.  (AR 73–74; *see also* AR 809.)  Plaintiff and her husband attribute this improvement to Plaintiff's focus on reducing stress and keeping her heart rate below a certain threshold.  (*See* AR 85–87, 293, 335.)  She moderates her activities, rests throughout the day, and avoids physical activity that would strain her heart.  (*Id.*)  Since entering disability retirement, Plaintiff has also engaged in travel, including attending meditative retreats in Kentucky and Georgia, spending four weeks in Europe with her husband, visiting France to learn French, and venturing on a three-week cruise.[5]  (AR 705, 1293, 1301; *see also* AR 250–51.)

---

[4] Further, Dr. Hugh Calkins, director of the ARVD/C Program at Johns Hopkins Hospital, provided a letter stating that it is common for patients with ICDs to experience increased stress and anxiety as a result of receiving an electric shock anytime the heartbeat becomes too irregular.  He goes on to state that patients can become "quite limited with daily tasks they are comfortable completing without causing arrhythmias."  (AR 990–91.)

[5] As part of her request to the agency's Appeals Council to review the ALJ's decision, Plaintiff submitted a declaration stating she engaged in this travel with restrictions related to her heart condition, and her visit to France to take a French language course was cut short due to the exertion required.  (AR 250–51.)

Further, since 2013, Plaintiff has suffered from chronic back and leg pain, which she states has not significantly improved with treatment. (AR 312; *see also* AR 1071–73, 1202–06, 1226–29.) The clinical origin of her pain was diagnosed as lumbar degenerative disk disease with right and left sided radiculopathy. (AR 1059–60.) In response to Plaintiff's ongoing pain, her physician, Dr. Annie Cheng, a specialist in physical medicine and rehabilitation, ordered a CT scan that revealed multi-level degenerative arthritis of the spine. (AR 1070–77.) By 2014, Plaintiff's pain had worsened, and her physical abilities, such as the ability to practice gentle yoga, became increasingly limited. (AR 1201–10.) When her physical therapy treatments proved painful, Plaintiff underwent right and left L5-S1 transforaminal epidural steroid injections. (AR 1058–61; *see also* AR 1066–1069, 1208–10, 1227.) She experienced some intermittent relief from this procedure. (AR 1227.)

Based on primarily her heart and spinal conditions, Plaintiff applied on June 12, 2013, for disability insurance benefits under the Act, alleging disability beginning on September 28, 2010. (AR 254–55, 285, 289, 293.)

## II.     LEGAL STANDARD

Under 42 U.S.C. § 405(g), an applicant for social security disability benefits may seek judicial review of a final decision of the Commissioner in federal district court. "As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A federal court will uphold the Commissioner's disability determination "unless it contains legal error or is not supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006)).

"'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th

Cir. 2007). When reviewing whether the Commissioner's determination is supported by substantial evidence, the court must consider the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks and citation omitted). However, the court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citation omitted).

## III. ADMINISTRATIVE DECISION

### A. Standard for Determining Disability

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act's implementing regulations, the Commissioner applies a five-step sequential evaluation process to determine whether an applicant for benefits qualifies as disabled. *See* 20 C.F.R. § 404.1520(a)(4). "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[6] 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the ALJ proceeds to step two.

---

[6] "Substantial gainful activity" is work activity that (1) involves significant physical or mental duties and (2) is performed for pay or profit. 20 C.F.R. § 404.1510.

– 7 –

At step two, the ALJ must determine whether the claimant has a severe medical impairment, or combination of impairments, that meets the duration requirement in the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant's impairment or combination of impairments is not severe, or does not meet the duration requirement, the claimant is not disabled. If the impairment is severe, the analysis proceeds to step three.

At step three, the ALJ must determine whether the severity of the claimant's impairment or combination of impairments meets or medically equals the severity of an impairment listed in the Act's implementing regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. If not, the analysis proceeds to step four.

At step four, the ALJ must determine whether the claimant's residual functional capacity ("RFC")—that is, the most she can do despite her physical and mental limitations—is sufficient for the claimant to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ assesses the RFC based on all relevant evidence in the record. *Id.* § 416.945(a)(1), (a)(3). If the claimant can perform her past relevant work, she is not disabled. If not, the analysis proceeds to the fifth and final step.

At step five, the Commissioner bears the burden of proving that the claimant can perform other work that exists in significant numbers in the national economy, taking into account the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c)(1), (c)(2); *see also id.* § 404.1520(g)(1). The ALJ usually meets this burden through the testimony of a vocational expert, who assesses the employment potential of a hypothetical individual with all of the claimant's physical and mental limitations that are supported by the record. *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012). If the claimant is able to perform other available work, she is not disabled. If the claimant cannot make an adjustment to other work, she is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

### B. ALJ's Disability Determination

On April 20, 2016, the ALJ issued a written decision concluding that Plaintiff was not disabled within the meaning of the Act. (AR 23–44.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset of her alleged disability in September 2010. (AR 25.)

At step two, the ALJ found that Plaintiff's cardiomyopathy, spine disorder, and major joint dysfunction qualify as severe medically determinable impairments under 20 C.F.R § 404.1520(c). (AR 25.) Plaintiff also suffers from epilepsy, but the ALJ determined that her epilepsy was non-severe because it manifested with seizures only periodically and was reported in her medical records to be well controlled with medication. (AR 25–26.) In addition, the ALJ found Plaintiff's medically determinable mental impairments to be "affective disorder" and "anxiety," but determined these impairments did not cause "more than a minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe." (AR 26–30.)

After determining that Plaintiff's severe impairments are limited to her physical ailments, the ALJ found at step three that Plaintiff's cardiomyopathy, spine disorder, and major joint dysfunction do not meet or medically equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 30.)

Next, the ALJ assessed that Plaintiff has the RFC to perform "light work" as defined in the Social Security regulations.[7] (AR 31.) He based this determination in large part on the RFC assessments conducted by two state medical consultants, Drs.

---

[7] As defined in 20 C.F.R. § 404.1567:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as . . . [an] inability to sit for long periods of time.

– 9 –

V. Michelotti and David Haaland, in January and May 2014, respectively. (AR 39.) The ALJ assigned both of these opinions great weight because "they are supported by the medical evidence of record and . . . support[] a full range of light work." (*Id.*) Additionally, the ALJ assigned great weight to the 2013 medical opinion of Dr. Moyad, a state consultative examiner and orthopedic doctor, because this opinion "is from an evaluating source whose opinion is consistent with the objective and other substantial evidence of record." (AR 40.) The ALJ also assigned great weight to the opinion of the state examining psychiatrist Dr. Gregory M. Nicholson, who found Plaintiff is "able to perform work activities on a consistent basis." (AR 41–42.) Likewise, the ALJ assigned great weight to the opinion of state psychological consultant Dr. Phaedra Caruso-Radin and state psychiatric consultant Dr. B. Smith, who did not examine Plaintiff, but found based on their evidentiary review in 2013 and 2014, respectively, that her affective disorder and anxiety are not severe. (AR 42.)

On the other hand, the ALJ assigned little weight to the medical opinions of two of Plaintiff's treating cardiologists, Drs. Sarduhl Singh and Joseph Blatt, reasoning that their opinions are "not consistent with the record as a whole that showed the claimant had unremarkable cardiovascular physical exams." (AR 40.) Similarly, the ALJ rejected the medical opinion of Plaintiff's treating primary care physician, Dr. Yuan Zhong. (AR 41.) The ALJ reasoned Dr. Zhong's opinion was inconsistent with the record as a whole, which showed "intact musculoskeletal range of motion, normal gait, normal reflexes, and intact neurological findings that support a light work limitation." (*Id.*) With respect to Plaintiff's testimony regarding her debilitating symptoms, the ALJ determined she was not entirely credible because, among other reasons, he believed her daily activities and "extensive travel" were inconsistent with her complaints of debilitating pain and fatigue. (AR 32, 37.) Finally, the ALJ assigned little weight to Plaintiff's husband's testimony because of his familial bias. (AR 42.)

– 10 –

At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a Supervising Deputy Attorney General.  (AR 43.)  As described by the vocational expert who testified at Plaintiff's hearing, an attorney job, as generally performed, is sedentary work with a specific vocational preparation ("SVP") level of eight.  (*See* AR 70.)  *See also Dictionary of Occupational Titles* § 110.117-010 DISTRICT ATTORNEY (4th ed. 1991).  Based on Plaintiff's description, the ALJ determined her particular attorney job, as actually performed, could require an exertional capacity of light work.  (AR 43.)  Because the ALJ found Plaintiff to be capable of light work, he concluded she was able to perform her past relevant work as it was "actually and generally performed."  (*Id.*)  As a result of this finding at step four, the ALJ concluded Plaintiff was not disabled and did not make any determinations at step five regarding her ability to perform other work.  (*Id.*)

## IV.   ANALYSIS

In Plaintiff's Motion for Summary Judgment, she argues the ALJ erred in determining her RFC by discounting her treating physicians' opinions and instead relying on the opinions of examining and reviewing physicians.[8]  (Pl.'s Mot. 18:7–25:4.)  The Commissioner responds to this point in turn.  (Def.'s Mot. 5:17–11:12.)  Should the Court find that the ALJ committed harmful error, the parties also request different remedies.  (Pl.'s Mot. 25:14–20, Def.'s Mot. 11:13–12:14.)

---

[8] Plaintiff's moving papers do not brief any other possible claims of error, such as whether the ALJ articulated specific, clear, and convincing reasons to support his determination that Plaintiff's testimony regarding the severity of her symptoms is not entirely credible.  (*See* Pl.'s Mot. 18:7–25:4.)  Because the Court determines that remanding for further proceedings is appropriate based on the claim of error raised in Plaintiff's moving papers, the Court limits its review to this issue.

– 11 –

## A.    The ALJ's Consideration of Physician Testimony

The Act's implementing regulations require an ALJ to give appropriate weight to all medical opinions, distinguishing between those of treating physicians, examining physicians, and non-examining (reviewing) physicians.[9]  20 C.F.R. § 404.1527.  As a general rule, the opinion of a treating source is entitled to greater weight than the opinion of doctors who do not treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  "The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

The degree of deference given to a treating physician's opinion depends on whether the physician is a specialist and to what extent that opinion is contradicted.  The regulations dictate that an ALJ should "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(4).  In addition, if a treating doctor's opinion is both "well-supported by medically acceptable clinical and laboratory techniques" and is "not inconsistent with the other substantial evidence in [the] case record," that opinion is given "controlling weight."  *Id.* § 404.1527(c)(2).  Such an opinion may be rejected "only for 'clear and convincing' reasons supported by substantial evidence in the record." *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting *Lester*, 81 F.3d at 830).  In cases where a treating doctor's opinion is contradicted by another doctor's opinion, an ALJ may reject the treating doctor's opinion only by providing "specific and legitimate reasons that are supported by substantial evidence."  *Garrison*, 759 F.3d

---

[9] Treating physicians are those who treat the claimant, examining physicians are those who examine but do not treat the claimant, and reviewing physicians are those who neither examine nor treat the claimant and instead review the claimant's file.  *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830).

– 12 –

at 1012 (quoting *Ryan*, 528 F.3d at 1198). An ALJ satisfies the substantial evidence requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Reddick*, 157 F.3d at 725). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725.

Having reviewed the parties' briefs and the voluminous record, the Court finds the ALJ erred in considering the medical opinion testimony on two grounds. First, the ALJ improperly discounted or failed to address the opinions of three treating cardiologists. Second, the ALJ similarly failed to address the opinion of Plaintiff's treating specialist in physical medicine. Because the Court ultimately determines that these errors are harmful and require that this action be remanded for further proceedings, the Court limits its discussion to these medical opinions.

### 1.    Cardiology Specialists

Plaintiff supported her disability claim with opinions by three treating cardiologists—Drs. Blatt, Cannom, and Singh.[10] Given that these physicians are specialists, the ALJ generally should have given their opinions in their area of specialty more weight than "the medical opinion of a source who is not a specialist." *See* 20 C.F.R. § 404.1527(c)(4). None of the state consultants that examined or reviewed Plaintiff's case are specialists in cardiology. Nor did they render an opinion

---

[10] Because Plaintiff filed her claim before March 27, 2017, the operative regulation defines "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *See* 20 C.F.R. § 404.1527.

– 13 –

on the limitations caused by her ARVD/C.[11]  With this in mind, the Court considers whether the ALJ provided specific and legitimate reasons to reject or assign little weight to these opinions.[12]

### i.    Dr. Singh

Dr. Singh diagnosed Plaintiff's ARVD/C, implanted and replaced her ICD, and regularly monitored her heart function before he retired in 2012.  (*See* AR 279, 286, 1004.)  In a Physician's Report on Disability submitted to CalPERS in August 2010, Dr. Singh opined that: (i) Plaintiff has a "life threatening structural heart disease"; (ii) she is "substantially incapacitated" from performing the usual duties of her job as a Supervising Deputy Attorney General; and (iii) Plaintiff's incapacity is permanent.  (AR 1005–06.)

The ALJ gave little weight to the opinion of Dr. Singh.  (AR 40.)  The ALJ rationalized that Dr. Singh's opinion is inconsistent with the record as a whole "that showed the claimant had unremarkable cardiovascular physical exams and her heart condition was stable throughout the period under adjudication."  (*Id.*)  The ALJ also discounted Dr. Singh's opinion because "it is an assessment of the claimant's ability to perform past relevant work, which is an opinion on an issue reserved to the Commissioner."  (*Id.*)

_____

[11] Dr. Moyad, an orthopedic specialist, commented on the expected limitations of Plaintiff's spinal condition.  (AR 1048–52.)  The state examining psychiatrist, Dr. Gregory Nicholson, evaluated her mental impairments.  (AR 1028–33.)  Additionally, Drs. David Haaland and V. Michelotti, state reviewing physicians, referenced Plaintiff's heart condition, but they opined on the exertional restrictions from her spinal condition.

[12] Arguably, because the state consultants did not render a substantive opinion on Plaintiff's heart condition, her treating cardiologists' opinions are not "inconsistent with the other substantial evidence in [the] case record."  *See* 20 C.F.R. § 404.1527(c)(2).  If so, these opinions are entitled to controlling weight and could be rejected "only for 'clear and convincing' reasons supported by substantial evidence in the record."  *See Orn*, 495 F.3d at 632 (quoting *Lester*, 81 F.3d at 830).  The ALJ, however, interpreted these opinions as being inconsistent with certain diagnostic tests and treatment notes.  Ultimately, because the Court concludes the ALJ's decision fails to satisfy the more lenient specific and legitimate reasons standard, the Court need not determine whether it must apply the more stringent clear and convincing reasons standard in this case.  *See id.*

– 14 –

The Court concludes these rationales are not specific and legitimate reasons to discount the opinion of Dr. Singh, a treating specialist. The ALJ's first rationale regarding cardiovascular exams corresponds with his summary of the cardiac evidence, in which the ALJ notes: "The claimant's heart imaging reports show she has a history of ventricular tachycardia with implantation of [an ICD], but the findings generally showed a well-functioning heart." (AR 36.) In considering this interpretation of diagnostic findings, the Court notes that "[a]n 'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" *See Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). The ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Id*. (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

The ALJ succumbed to this temptation here. In characterizing Plaintiff's heart as generally "well-functioning," the ALJ interpreted the results of an October 21, 2010, echocardiogram. (AR 1087–88.) This procedure revealed "[m]ild to moderate depression of left ventricular systolic function with regional wall motion abnormalities." (AR 1088.) The accompanying write-up notes these results "appear nearly identical" to an echocardiogram performed in April 2009. (*Id.*) Dr. Singh relied on the same April 2009 echocardiogram to form his conclusion that Plaintiff's heart function had deteriorated and both cardiac chambers were enlarged. (AR 1004; *see also* AR 562 (noting a recent echocardiogram showed "moderate to severe" left ventricular function depression).) Further, in Dr. Singh's corresponding disability report submitted to CalPERS, Dr. Singh opined that Plaintiff's "cardiac function has deteriorated to 40% despite therapy with medication and AICD implant." (AR 1005.)

Instead of deferring to the treating specialist's medical interpretation that "mild to moderate depression of left ventricular systolic function" is consistent with a heart operating at significantly reduced capacity, the ALJ concluded that the "findings generally showed a well-functioning heart." (*See* AR 36.) This conclusion, however,

– 15 –

is no substitute for competent medical opinion. *See Banks*, 434 F. Supp. 2d at 805. Furthermore, if the ALJ suspected that the cardiac evidence pointed toward a greater functional capacity than that indicated by Dr. Singh, "the ALJ should have consulted a qualified medical expert to attempt to confirm or dispel [his] suspicion." *See Corr v. Astrue*, No. ED CV 11-7890-E, 2012 WL 1745607, at *5 (C.D. Cal. May 16, 2012). The ALJ did not do so.

The ALJ's reliance on Plaintiff's "unremarkable cardiovascular physical exams" after her ICD was implanted is similarly inadequate. Throughout the record, Plaintiff's exams occasionally noted cardiovascular symptoms, such as chest pain, shortness of breath, and palpitations. (*See, e.g.*, AR 458, 547, 844, 913, 1050.) Further, many of Plaintiff's clinical exams were asymptomatic concerning her cardiovascular functioning, but these exams occurred after Dr. Singh implanted Plaintiff's ICD, which regulates her heart beat. (*See, e.g.*, AR 917.) The ALJ's reasoning suggests that her lack of an irregular heartbeat during these exams means Plaintiff does not suffer from a serious heart condition that imposes functional restrictions. The Court finds this interpretation by the ALJ is an inadequate basis to reject the opinion of Plaintiff's treating cardiologist. Again, if the ALJ suspected that the cardiac evidence pointed toward a greater functional capacity than that indicated by Dr. Singh, "the ALJ should have consulted a qualified medical expert to attempt to confirm or dispel [his] suspicion." *See Corr*, 2012 WL 1745607, at *5.

In the same vein, the Court finds the ALJ's reliance on medical records reporting Plaintiff's heart condition as "stable" is not a specific and legitimate reason supported by substantial evidence to reject Dr. Singh's opinion. "[A] condition can be stable but disabling." *Petty v. Astrue*, 550 F. Supp. 2d 1089, 1099 (D. Ariz. 2008); *see also Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work."). Although treatment notes indicate Plaintiff's heart condition was "stable" after she entered disability retirement, that does not mean she

can return to her past relevant work or other employment. There is no dispute that Plaintiff still suffers from a severe, progressive heart disease. Given Plaintiff's serious medical condition, and her "ongoing need for continued aggressive medical therapy after h[er] ICD was surgically implanted, it was an unreasonable inferential leap for the ALJ to conclude that Plaintiff's currently stable, asymptomatic condition failed to support" Dr. Singh's opinion. *See Rawlings v. Colvin*, No. 14-cv-00159, 2015 WL 3970608, at *5 (S.D. Ohio June 30, 2015). Thus, the Court finds the ALJ's reliance on records noting Plaintiff's progressive heart condition is "stable" is a legally insufficient basis to discount Dr. Singh's opinion.

The ALJ's other rationale for rejecting Dr. Singh's opinion is similarly inadequate. The ALJ reasoned Dr. Singh's opinion should be given "little weight" because the opinion is on an issue reserved to the Commissioner, but that rationale "is not by itself a reason for rejecting that opinion." *See, e.g.*, *Esparza v. Colvin*, 631 F. App'x 460, 462 (9th Cir. 2015) (rejecting the ALJ's assertion that a treating physician's opinions could be rejected because "they were 'on an issue reserved to the Commissioner'") (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202–03 (9th Cir. 2001)).

In sum, the ALJ failed to provide "specific and legitimate reasons that are supported by substantial evidence" to reject treating specialist Dr. Singh's opinion regarding Plaintiff's heart condition. *See Garrison*, 759 F.3d at 1012.


### ii.    Dr. Blatt

Dr. Blatt, who took over as Plaintiff's treating cardiologist in 2012 when Dr. Singh retired, completed an RFC assessment dated September 14, 2014. (AR 1080–84.) Based on Plaintiff's cardiac condition, Dr. Blatt assessed that she can only occasionally lift less than 10 pounds and can stand for at least two hours, but not six hours, in an eight-hour workday. (AR 1080.) In addition, in a letter dated the same day, Dr. Blatt wrote that Plaintiff's heart condition "continues to cause symptoms of

anxiety, fatigue, and palpitations," and because of this condition, "she should avoid strenuous activities such as pushing, pulling, or lifting weight over 10 lbs." (AR 1079.)

As he did when discounting Dr. Singh's opinion, the ALJ assigned little weight to Dr. Blatt's opinion because he reasoned it is "not consistent with the record as a whole that showed the claimant had unremarkable cardiovascular physical exams and her heart condition was stable throughout the period under adjudication." (AR 40.) The ALJ further rationalized that Dr. Blatt's opinion "appear[s] to be inconsistent with Dr. Blatt's report of July 17, 2013, wherein he replied it was not clear to him that the claimant was disabled." (*Id.*)

The ALJ's initial justification for discounting Dr. Blatt's opinion is inadequate for the same reasons that are discussed above with respect to Dr. Singh's opinion. The ALJ cites findings from Plaintiff's doctor visits to support his conclusion that exam results show "intact cardiovascular . . . findings consistent with an ability to do the full range of light work." (AR 33.) No physician of record, however, opined that these findings demonstrate that Plaintiff—despite her documented, rare, and serious heart condition—has a functional capacity of light work and can return to her prior relevant work as an attorney. The ALJ cannot displace the opinion of Plaintiff's treating specialist with the ALJ's own interpretation of Plaintiff's medical records, particularly where the state examining and reviewing physicians did not opine on the limitations caused by her ARVD/C. *See Banks*, 434 F. Supp. 2d at 805.

The ALJ's reliance on what he characterized as an apparent inconsistency in Dr. Blatt's treatment records is also not a sufficient basis to discount the treating specialist's assessment of Plaintiff's RFC. On July 7, 2013, Dr. Blatt noted:

//

//

//

//

> [Plaintiff] also requests a letter for disability. It is not clear to me that she is disabled, but she shows me letters from internationally well known cardiologists who have reviewed her case and have deemed her fit for disability (Cauwkins [sic] and Cannom). I wrote her a letter stating that I am taking care of her currently and cannot disagree with the assessment by these physicians.

(AR 881.) About a year later, Dr. Blatt opined on Plaintiff's exertional limitations in the aforementioned September 2014 letter and RFC Assessment. Dr. Blatt did not, however, opine that Plaintiff is "disabled" or incapable of work altogether; he identified functional limitations based on her condition. (*See* AR 1080–83; *see also* 1079.) Upon examination, there is no inconsistency between Dr. Blatt's (i) uncertainty in 2013 about whether Plaintiff is "disabled," and (ii) his specific opinion as to her functional limitations rendered in 2014. (*See* AR 881, 1079, 1083–83.) The Court thus finds this second reason is also not legally sufficient for the ALJ to assign "little weight" to the entirety of Dr. Blatt's opinion. Hence, the ALJ erred in discounting Dr. Blatt's opinion without providing "specific and legitimate reasons that are supported by substantial evidence" for doing so. *See Garrison*, 759 F.3d at 1012.

### iii.   Dr. Cannom

Dr. Cannom, an ARVD/C specialist who helped diagnose and treat Plaintiff's heart condition in 2006, wrote a letter regarding Plaintiff dated August 12, 2010. (AR 996–97.) In this letter, Dr. Cannom opined that it is "very prudent for [Plaintiff] to seek disability as she has a severe cardiomyopathy that is progressive and has arrhythmias that are from the myopathy that are poorly controlled." (*Id.*) He further opined that Plaintiff "is receiving the maximum medical therapy but is highly symptomatic despite this." (AR 997.) Although the ALJ discounted Dr. Blatt's and Dr. Singh's opinions, the ALJ did not mention the weight he assigned to Dr. Cannom's opinion. (*See* AR 40.) Absent explanation, the ALJ's conclusion that

– 19 –

Plaintiff can return to her past work as an attorney cannot be reconciled with Dr. Cannom's opinion regarding her heart condition.

The agency's regulations provide that it will "evaluate every medical opinion" the agency receives. 20 C.F.R. § 404.1527(c). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13. Because the ALJ appears to have rejected or assigned minimal weight to Dr. Cannom's opinion without explanation, the ALJ erred. *See id.*

In sum, the Court finds the ALJ erred in discounting or failing to evaluate the opinions of Plaintiff's three treating heart specialists—Drs. Singh, Blatt, and Cannom.

### 2.  Physical Medicine and Rehabilitation Specialist

The ALJ found that one of Plaintiff's severe medical impairments was her spine disorder. (AR 25.) Yet, the ALJ's decision does not address the opinion of Plaintiff's treating specialist in physical medicine, Dr. Annie Cheng. (*See* AR 23–44.)

Dr. Cheng began treating Plaintiff's spine disorder in late 2013 after a referral from another treating doctor, Dr. Ambach. Dr. Cheng ordered a CT scan, the results of which helped diagnose Plaintiff's degenerative disk disease. (AR 1205–06.) In March 2014, Dr. Cheng noted that Plaintiff was suffering from mobility deficits in her spine with radiating symptoms into her left leg and that she would benefit from physical therapy to help with sitting and sleeping. (AR 1062.) By October 2014, Plaintiff had experienced some limited improvement in her back pain with physical therapy and steroid injections. (AR 1227.) Dr. Cheng opined that Plaintiff should not lift more than five to ten pounds. (*Id.*) Ultimately, based on Plaintiff's CT scan,

– 20 –

Dr. Cheng found that the disk degeneration was consistent with her symptoms, and that despite intermittent relief, her back pain is "a chronic and incurable condition that would be worsened with prolonged sitting and any regular lifting or twisting motions." (AR 1228–29.)

As mentioned above, the agency's regulations provide that it will evaluate each opinion it receives, 20 C.F.R. § 404.1527(c), and an ALJ errs in rejecting a medical opinion "while doing nothing more than ignoring it," *Garrison*, 759 F.3d at 1012–13. The ALJ did not provide a legally sufficient explanation for disregarding Dr. Cheng's opinion—he provided no explanation. Although it appears that the ALJ relied on the opinions of non-treating physicians Drs. Moyad, Michelloti, and Haaland to assess Plaintiff's physical limitations as a result of her spinal condition, the ALJ did not explain why these opinions were more persuasive than Dr. Cheng's opinion, which assesses greater physical limitations and is entitled to greater weight. (*See* AR 39.) Because an ALJ errs when he rejects a medical opinion "while doing nothing more than ignoring it," the ALJ committed legal error by not addressing Dr. Cheng's opinion in his decision. *See Garrison*, 759 F.3d at 1012–13.

**B.    Harmless Error Analysis**

Having found that the ALJ erred in considering the medical opinion testimony in the record, the Court must now consider whether the ALJ's errors are harmless. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008)). In assessing whether an error is harmless, the court "look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id*.

The ALJ's errors are not harmless. After discounting or failing to evaluate the opinions of the cardiologists and the physical medicine specialist discussed above, the ALJ based Plaintiff's RFC on his own interpretation of Plaintiff's heart condition,

the opinions of state examining physicians, and the opinions of non-examining physicians. The resulting RFC is less restrictive than that suggested by the medical opinions the ALJ improperly discounted or rejected. This incorrect RFC assessment, in turn, distorted the ALJ's determination at step four that Plaintiff could perform her past relevant work as a Supervising Deputy Attorney General. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) ("[A]n RFC that fails to take into account a claimant's limitations is defective."). Further, because of this inaccurate RFC, the ALJ did not reach the final step of the disability analysis. (AR 44.) Accordingly, the ALJ's errors are not inconsequential to the disability determination, and the Court finds the ALJ committed harmful legal error. *See Molina*, 674 F.3d at 1115.

### C. Appropriate Remedy

Having concluded the ALJ committed harmful legal error, the Court must determine the appropriate remedy. "[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). This "ordinary remand rule" respects the Commissioner's role in developing the factual record, and helps guard against the displacement of administrative judgment by judicial decree. *See Treichler*, 775 F.3d at 1099–00. When an ALJ makes a legal error, but there are ambiguities or outstanding issues in the record, the proper approach is to remand for further proceedings, not to apply the "credit as true" rule. *See id.* at 1105.

For this Court to depart from the ordinary remand rule and award benefits under the credit as true rule, three requirements must be met. *Garrison*, 759 F.3d at 1019–21. First, the court must determine that the ALJ committed legal error, such as by failing to provide legally sufficient reasons for rejecting certain evidence. *Dominguez*, 808 F.3d at 407. Second, if the court finds such error, it must determine

whether "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Garrison*, 759 F.3d at 1020. In making this determination, the court reviews the record as a whole and asks whether there are conflicts, ambiguities, or gaps in the record such that essential factual issues have not been resolved. *Dominguez*, 808 F.3d at 407 (citation omitted). Where there are outstanding issues that require resolution, the proper approach is to remand the case to the agency for further proceedings. *See Treichler*, 775 F.3d at 1101, 1105.

If the court determines that the record has been fully developed and there are no outstanding issues left to be resolved, the court must next consider whether "the ALJ would be required to find the claimant disabled on remand" if the "improperly discredited evidence were credited as true." *Dominguez*, 808 F.3d at 407 (quoting *Garrison*, 759 F.3d at 1020). "If so, the district court may exercise its discretion to remand the case for an award of benefits." *Id.* However, even when the requirements of the credit as true rule are satisfied, district courts retain flexibility to remand for further proceedings when the record as a whole creates "serious doubt" as to whether the claimant is disabled. *Id.* at 1021.

In her Motion for Summary Judgment, Plaintiff requests this Court "seriously consider granting a reversal and ordering benefits be paid forthwith." (Pl.'s Mot. 25:18–20.) Plaintiff makes this request in light of the "additional time delays in this case, and Defendant's lengthy mishandling of this claim." (*Id.*) This showing is inadequate. Plaintiff does not identify the "additional time delays" in this case or explain why it has been lengthily "mishandled" by the Commissioner. Further, Plaintiff does not brief the credit as true requirements in her Motion for Summary Judgment; she only briefly raises them in her combined Opposition and Reply after the Commissioner requests this case be remanded for further proceedings if there is error. (*See* Def.'s Mot. 11:13–12:14; Pl.'s Opp'n & Reply 22:14–23:3.) Even then, Plaintiff simply states that she "has satisfied all three conditions of the credit as true rule." (Pl.'s Opp'n & Reply 22:14–23:3.) The Court is unconvinced by Plaintiff's

attempt to demonstrate these are "rare circumstances" where the Court should not "remand to the agency for additional investigation or explanation." *See Benecke*, 379 F.3d at 595.

Moreover, aside from this inadequate showing, the Court finds that not all of the credit as true requirements are satisfied. In particular, it is not clear from the record that the ALJ would be required to find Plaintiff disabled on remand if the improperly discredited medical opinions were credited as true. *See Dominguez*, 808 F.3d at 407. When credited as true, the rejected cardiology opinions discussed above establish that Plaintiff cannot return to her prior work as an attorney. But that conclusion does not mean Plaintiff is also precluded from performing other available work. For instance, Dr. Singh's report submitted to CalPERS in 2010 opines that Plaintiff is "substantially incapacitated from performance of the usual duties of" her position as a Supervising Deputy Attorney General, but that outcome does not necessarily mean she is precluded from performing other work. (*See* AR 1006.) And although Dr. Blatt provided a more recent RFC assessment, the evaluation is not conclusive. The assessment provides Plaintiff may stand or walk for "at least 2 hours in an 8-hour workday," but it is incomplete as to the amount of time Plaintiff may sit, with normal breaks, during an 8-hour work day. (*See* AR 1080.) Hence, Dr. Blatt's opinion similarly does not establish the ALJ would be required to find Plaintiff disabled on remand.

Further, "[i]n cases where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," courts "consistently have remanded for further proceedings rather than payment of benefits." *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000); *see also, e.g.*, *Graham v. Colvin*, No. C14-5311BHS, 2015 WL 509824, at *7 (W.D. Wash. Feb. 6, 2015) (remanding for further proceedings where there was a "lack of vocational expert testimony based on the limitations" contained in improperly discredited evidence). Here, the vocational expert was asked a hypothetical by Plaintiff's

attorney that included some of the limitations assessed by the discredited physicians' opinions, including that of Dr. Cheng—the physical medicine and rehabilitation specialist. (*See* AR 88.) This hypothetical also included, however, that the hypothetical person "would be required to have the ability to take a nap, or rest at some point during that workday for, say, two hours." (*Id.*) Neither Dr. Blatt's RFC assessment nor Dr. Cheng's opinion assessed this specific limitation. If the hypothetical was limited to the limitations established by the improperly discredited evidence, it is unclear whether the vocational expert would still have testified there are no available jobs that the person could perform. (*See id.*) Thus, for this reason as well, the appropriate remedy is to remand this action for further proceedings. *See Harman*, 211 F.3d at 1180.

In sum, in exercising its discretion under 42 U.S.C. § 405(g), the Court declines to depart from the ordinary remand rule in this case.

## V.    CONCLUSION

In light of the foregoing, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 9) and **DENIES** Defendant's Cross-Motion for Summary Judgment (ECF No. 10). The Court **REMANDS** this action for further proceedings consistent with this order. *See* 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

**DATED: September 6, 2018**

Hon. Cynthia Bashant
United States District Judge

17cv1920